## Oscar B. McGlasson, Defendant in Error, v. Thomas Hennessy, Plaintiff in Error.

### Gen. No. 15,586.

LIENS—*section 49 of act relating to stable keepers construed.* A lien exists in favor of a stable keeper for the board etc. of a horse etc. as against a mortgagee taking possession from the owner, where the mortgagee has notice of facts sufficient to put him upon inquiry and where though the possession of the horse, etc. temporarily passed out of the stable keeper it became restored through no act of such stable keeper.

Trover. Error to the Municipal Court of Chicago; the Hon. EDWIN K. WALKER, Judge, presiding. Heard in this court at the October term, 1909. Reversed and judgment here. Opinion filed May 4, 1911.

RICHARD I. GAVIN, for plaintiff in error.

Mather & Hutson, for defendant in error.

Mr. Justice Brown delivered the opinion of the court.

This is a writ of error to the Municipal Court of Chicago to reverse its judgment for $150 and costs in trover, as an alternative to one for the recovery of certain property (a horse, wagon and harness) in a replevin suit. The judgment was in favor of Oscar B. McGlasson, the defendant in error, and against Thomas Hennessy, the plaintiff in error. The cause was tried by the court without a jury.

There are. accusations of "fraud," "subterfuge," "conspiracy," etc., in the brief and argument of counsel for plaintiff in error, which seem to us entirely uncalled for and irrelevant. The question presented by the record is an interesting and delicate one of law. Material facts are not in dispute and can be reconciled with the existence of a mere difference in opinion between the parties as to their respective rights, without imputing bad faith or blameworthy motives to either one.

Those facts are these: Mr. McGlasson, who is secretary and treasurer of the McNeil & Higgins Co., on January 20, 1909, held a chattel mortgage, the date of which does not appear, on certain property belonging to Mrs. Clara C. Miller at 197 Clark street in Chicago. The property was a stock of groceries in a store at that number and a horse, wagon and harness. From the events which took place it is a fair presumption that Mr. McGlasson represented his corporation in the matter, but that is immaterial.

On the day in question McGlasson instructed Charles C. Williams, who was connected with the credit department of the McNeil & Higgins Company, to foreclose this chattel mortgage, but told him if Mrs. Miller wished to save the expense of a foreclosure of the chattel mortgage, to take a bill of sale of the property and possession of the place. Mr. Williams

went to the place and Mrs. Miller gave him possession of the store, with the keys.  At the same time Mr. Williams drew a bill of sale of certain property, presumably that covered by the mortgage (but that also is immaterial), running from Clara C. Miller to Oscar B. McGlasson, in satisfaction of the said mortgage.

This bill of sale Mrs. Miller signed and delivered to Mr. Williams for Mr. McGlasson.  It described property as follows:

"One coffee mill, two scales, one ice box, one stove, one desk, all counters, shelving and other fixtures of every kind and description.  Also all stock of groceries, consisting of flour, sugar, coffee, teas, spices, baking powder, bottled goods, can goods, etc., all contained in the store room known as 197 Clark street, Chicago, Illinois. *Also one top delivery wagon, one set single harness and one horse now kept in the 'Erie Livery Stable' located at 199-201 East Erie Street, Chicago, Illinois.*"

The horse and wagon and harness were kept when not in use by Mrs. Miller in her retail grocery business at the livery and board stable of Hennessy, the plaintiff in error, on Erie street at the number indicated in the bill of sale.  They had been kept there and the horse fed there for seven or eight months.  On January 20, 1909, there was due for that keeping from Mrs. Miller to Hennessy two months' board, amounting to $44.  Mr. Hennessy testified that Mr., and not Mrs. Miller, first brought the horse and wagon to his stable, and said that he owned them; but this also is wholly immaterial in this suit and there can be no doubt that they really belonged, as represented in the bill of sale, to Mrs. Miller.

Mrs. Miller had a driver in her employ named Curtis, and Curtis used to come after the horse and wagon each day and bring them back to the stable each evening.  At the time of the delivery of the bill of sale and possession of the store to Mr. Williams for Mr. McGlasson, the horse and wagon were standing in

front of the store at 197 North Clark street. Mr. Williams testified: "I took possession of the store and contents and the horse and wagon—out in front of the store, it was, at 'that time."

After Mr. Williams took possession of the place and property he put a custodian named Ellis in charge of it, and the business proceeded for a few days while McGlasson (or the McNeil & Higgins Company if that company was in reality the beneficial owner) tried "to sell the place out." Mrs. Miller stayed on and helped in the business. Curtis, the driver, took charge of the delivery wagon as usual.

January 20, 1909, was Wednesday. On the following day apparently, Mr. McGlasson visited the store of which he had taken possession, and there saw Mr. Hennessy, who had been talking with Mr. Miller about the bill for feed and board then due him from Mrs. Miller. A conversation concerning the value of the horse and wagon followed between Hennessy and Mc-Glasson, but not about the bill which was due for board.

There is some uncertainty of days and dates in the testimony of the witnesses as to subsequent events involved in this controversy, and it is impossible to tell with accuracy the intervals between events. But it is immaterial. Curtis continued for a longer or shorter time—for a day or two or three, or (as seems from some of the testimony possible) for a week—to use the horse and wagon for delivery purposes during the day and return them to Hennessy's stable at night. But after the lapse of this time Mr. McGlasson and Mr. Williams, his agent, gave orders to the custodian, Ellis, to put up the horse and wagon at another stable in the vicinity; so Curtis, the driver, on one morning took them out as usual, but carried them that night to the other stable. A day or two afterward the horse with the wagon being left in front of a hotel near Hennessy's stable while the driver, Curtis,

was delivering groceries to the hotel, walked off and into his old quarters at Hennessy's.   The driver followed him and asked for him, because there were still groceries to deliver.   Hennessy seems first to have consented, but upon an incidental remark from Curtis that "the day was probably his last one," and that the store was probably about to finally change hands, reconsidered his assent and then refused and has since refused to give up the horse, wagon and harness except on the payment of the bills due to him from both Mrs. Miller and Mr. McGlasson for the keeping. An attempt at compromise seems to have been made, but there is no claim either that Mr. McGlasson has *not* been willing to pay for all the board or keeping of the horse and wagon since his obtaining the title to them, or that he *has* been willing or has offered to pay also the amount due from Mrs. Miller for such board and keeping before he thus became entitled.   It may be assumed from the evidence that McGlasson offered Hennessy more than enough to pay for such board and keeping while he (McGlasson) was owner of the property, but not enough to pay the entire bill due to Hennessy.

McGlasson having made an ineffectual demand for the delivery of the horse, wagon and harness to him without the payment of this bill, brought a suit in replevin and when the bailiff returned the writ unexecuted because of inability to find the property, declared in trover, with the result hereinbefore stated.

It is plain that the question in the case is purely on the construction of section 49 of the "Act to revise the law in relation to liens," approved March 25, 1874.   That section is as follows:

"Stable keepers and any persons shall have a lien upon the horses, carriages and harness kept by them for the proper charges due the keeping thereof and expenses bestowed thereon at the request of the owner or the person having the possession thereof."

If under this statute Hennessy had a lien for the

entire bill due him for the board and keeping of the property in question, he was not obliged to give them up; the right of possession when the suit was brought was not in McGlasson, and the judgment should have been *nil capiat* and for costs against him. If, on the other hand, Hennessy was not entitled to such a lien, then as McGlasson is under no liability to pay Mrs. Miller's debts, the proven withholding of the property by Hennessy justifies the judgment which was rendered against him.

Even if the horse had not voluntarily returned to the custody of Hennessy, and if there were nothing in the case affecting McGlasson with notice of anything which should have put him, before his purchase, on inquiry as to a possible or probable bill due to Hennessy for "board and keeping" of the property he bought,—in other words, if in the strictest sense McGlasson could be considered an innocent purchaser, without notice, of a horse bought from its real and ostensible owner during the time that owner had for use in the ordinary course of his business taken it out from the livery stable where it was boarded,— the question involved would still be a doubtful one, for diverse answers to which high authority could be adduced.

Thus, while the Supreme Judicial Court of Massachusetts, speaking through Mr. Justice Holmes, now of the Supreme Court of the United States, concerning a somewhat similar statute of Massachusetts, held in Vinal v. Spofford, 139 Mass. 126 (a very similar case to that at bar), that the statutory lien given by the Massachusetts statute to a person boarding a horse was nothing more than a common law lien dependent on continued possession for its existence, and was divested by the owner rightfully taking a horse from the stable keeper's custody and then selling him to a purchaser "in good faith and for a valuable consideration," yet in State v. Shevlin, 23 Mo. App. 598, a

statute of Missouri giving a stable keeper's lien for board was held to keep that lien good "as against third persons without notice while the horse is boarded in the stable of lienor, although it may with his consent be used during the day by the owner in his business;" and this although the statute contained the words "and such lien shall be valid against said property in the possession of any person receiving or purchasing it *with* notice of such claim"—a provision which by exclusion might have been thought to negative such a claim.

To hold that the lien was preserved against a third person *without* notice only if the stable keeper had actual physical possession of the property, says Judge Seymour D. Thompson in that case, "would be to construe the statute so as to deprive stable keepers of the protection which the Legislature probably intended to give them, since, as is well known, in most cases where horses are boarded, the owner is allowed to use them in his business during the day. This being so, the statute could not have intended to allow the owner to destroy the lien of the stable keeper while having the possession of the horse on the street during the day by selling it or mortgaging it to a stranger without notice of the lien. On the contrary, we are of opinion that every person is bound so far to take notice of the statute, that when he is about to become the purchaser or mortgagee of a horse found upon the street in the custody of its owner, it is incumbent upon him to make inquiry as to the place where the horse is boarded and whether anything is due for its keeping. There is no greater hardship in this rule than there is in the general rule in respect of purchases of personal property, that the purchaser gets no better title than the seller has." Supporting this view of Judge Thompson may be cited such cases as: Welsh v. Barnes, 5 North Dakota, 277; Caldwell et al. v. Tutt, 78 Tenn. 258;

Young v. Kimball, 23 Pa. State 193; Walls v. Long-street, 2 Ind. App. 202, and others; and the weight of authority seems to be in its favor. See Am. & Eng. Enc. of Law, vol. 19, p. 442, and Cyc., vol. 25, p. 1511.

This position is strengthened as against the authority of Vinal v. Spofford (*supra*) by the consideration that the statute of Massachusetts does not, as does the Illinois statute, mention stable keepers *eo nomine,* but gives rather a general agister's lien for ''pasturing, boarding or keeping horses or other domestic animals,''—such a lien as is given in addition to the stable keeper's lien under consideration by the 50th section of our lien Act, which provides generally that ''agisters and persons keeping, yarding, feeding or pasturing domestic animals, shall have a lien upon the animals agistered, kept, yarded or fed, for the proper charges due for the agisting, keeping, yarding or feeding thereof.'' It would therefore seem that the stable keeper's lien given by the 49th section must have been intended to protect stable keepers in the particular circumstances described by Judge Thompson.

But however that may be we are not obliged to decide the question of the possible existence of the lien, if the case at bar did not contain the elements which we have noted of the return of the horse by his own volition and without the interference of the stable keeper to the stable keeper's custody, and the still more important fact that there is evidence of Mc-Glasson's knowledge, before he bought, of circumstances which were sufficient to put him on inquiry as to whether there was not a claim for board against the property in favor of the ''Erie Livery Stable located at 199-201 East Erie Street, Chicago.'' The description of the horse, wagon and harness in the bill of sale drawn by Mr. Williams, the agent of Mc-Glasson, and received by him as such agent, is, in our opinion, conclusive as to the fact that McGlasson must be charged with notice that the horse was boarded

at Hennessy's stable. That being so, we think that he was put upon inquiry as to any bill that might be owing for board there, and must be chargeable with such knowledge as reasonable inquiry would have revealed.

This seems to us consistent with the evident intention of the Legislature in the statute involved. It is not in conflict with the authority of the Massachusetts Supreme Court, for though the strict application of the logic of the opinion in Vinal v. Spofford might be inconsistent with it, the opinion in that case expressly limits its holding to a denial of the right of the stable keeper to replevy the horse after possession had been voluntarily given up.

Our conclusion as to the effect of the statute seems to us, moreover, not only in accordance with right reason and the doctrine of the Missouri, Tennessee, Pennsylvania and Indiana courts, but also in accordance with the holdings of our own courts on the not dissimilar question of the landlord's lien on growing crops. Watts v. Scofield, 76 Ill. 261; Hunter v. Whitfield, 89 Ill. 229; Finney v. Harding, 136 Ill. 573.

It follows from the views we entertain and have hereinbefore expressed, that on the question of law involved in the construction of the statute, and not from any difference from the court below as to the facts, we must reverse the judgment of the Municipal Court and enter a judgment here against the plaintiff of *nil capiat* and for costs.

*Reversed and judgment here.*