[C. A. No. 21. Appellate Department, Superior Court, City and County of San Francisco.—February 5, 1931.]

PACIFIC STATES FINANCE CORPORATION (a Corporation), Respondent, v. TONY FREITAS, Appellant.

(1 Cal. Supp. 112.)

Edgar C. Levey and Marvin E. Lewis for Appellant.

John P. Beale for Respondent.

William S. Downing and Philander P. Beadle, *Amici Curiae.*

JOHNSON, P. J.—This case presents the legal question of the right of a garage-keeper to assert a lien, under section 3051 (limited somewhat by section 3051a) of the Civil Code, for accumulated compensation for storage of an automobile and for repairs made and supplies furnished therefor, when the owner or person having control of the automobile is allowed to remove it day by day for use in his own pursuits.

The defendant Freitas is the proprietor of a garage known as the Motor Arms Garage in San Francisco.

In the month of January, 1929, the defendant Bonilla, who was then in lawful possession of a De Soto sedan automobile under a contract of conditional sale, made an arrangement with Freitas whereby, in view of certain financial exigencies of Bonilla, Freitas agreed to house the car on credit until December 1, 1929, at the rate of $7 per month. During that period of time the car was in daily use by Bonilla, being returned to the garage at night and there kept until again wanted by Bonilla. On December 1st, in addition to the storage charge of approximately eleven months, there appear to have been unpaid bills amounting to $40.28 for labor performed and for gasoline and other supplies furnished for the De Soto sedan. Bonilla being still unable to pay his indebtedness, Freitas thereupon notified Bonilla that the car could not be again taken from the garage until the bills were paid, and that the charge

for storage from December 1st would be 50 cents per day. No payment was made by Bonilla, and storage charges continued to accumulate until plaintiff instituted this action of claim and delivery, and caused the sheriff to take the car on February 8, 1930, from the possession of Freitas.

Plaintiff's cause of action is based on a contract in the form of a conditional sale agreement made on September 13, 1928, between Bonilla and San Francisco Sales Company and assigned by the latter to the plaintiff. The San Francisco Sales Company seems not to have been the seller of the car to Bonilla, but by the terms of the contract Bonilla promised to make certain monthly payments; and in case of default the creditor was authorized to take possession of the car and sell it at public or private sale. Bonilla having made default, plaintiff acted under the authority so conferred.

Before the action was begun, plaintiff, insisting that the car had been allowed to be taken from the garage as late as December 24, 1929, tendered to Freitas $20 as the amount payable for storage from that date to the time of tender, January 31, 1930, and demanded delivery of the car. The tender having been refused, this action followed.

In his answer to the complaint Freitas asserted a lien for all the compensation owing to him by Bonilla for storage, repairs and supplies.

In this connection it may be well to note that charges for several months had already accrued before the contract under which plaintiff claims was made on September 13, 1929, and that in that contract Bonilla undertook to house and protect the car against the elements. At the same time the contract provides that Bonilla should not create or permit any lien for storage, repairs or otherwise.

Plaintiff's contention on this appeal, and made also at the trial, is that a garage-keeper's lien for accrued charges is utterly lost if he voluntarily parts with physical possession, even though the car is to be returned after a brief interval.

The defendant Freitas contends on the other hand that temporary release of the car to Bonilla for daily use did not terminate the bailment or invalidate his statutory lien. The judgment of the trial court was based on acceptance of the view urged by plaintiff. Up to December 1, 1929,

Bonilla was permitted to have the car by day; but Freitas contends that from that time on the car was continuously in his actual possession. While there is a conflict of evidence on this point, the trial court apparently accepted the testimony of Freitas. For though the court, adopting plaintiff's view of the law, awarded possession of the car to plaintiff, the judgment made provision for payment to Freitas of $35, which represented the storage charge from December 1, 1929, to the time of the sheriff's seizure.

The question before us then is whether Freitas had a lien also for charges from January to December which was superior to the interest of plaintiff.

An automobile is a horseless carriage; and a garage is the modern adaptation, with some refinements, of the almost obsolete livery-stable. The proprietors in both cases house and care for common instruments of transportation; and in a sense may be said to be cousins german. The ubiquitous use of automobiles necessitates a multiplicity of housing places; and quite generally the safeguards securing payment of compensation to keepers of livery-stables have been extended to garage proprietors.

Section 3051 of the Civil Code as amended in 1878 (Stats. 1877–78, p. 89) provided for a lien on behalf of livery-stable keepers; and in 1911 (Stats. 1911, p. 887) there was appended to the section the clause reading: "and keepers of garages for automobiles shall have a lien, dependent on possession, for their compensation in caring for and safekeeping such automobiles". Then by the amendment which became effective August 14, 1929 (Stats. 1929, p. 1923), the lien was broadened to secure also charges "for making repairs and performing any labor upon or furnishing supplies or materials for such automobiles".

Both in the case of proprietors of livery-stables and of garages, the lien is declared to be "dependent on possession". ■ While the statute, being in derogation of the common law, is to be strictly construed in ascertaining and determining the persons to whom, and the subject matter to which, it is applicable, yet at the same time in its remedial aspect the enactment is to be liberally construed in furtherance of the beneficial purpose intended. (*Ogle v. King & Goodheart*, 2 City Ct. R. (N. Y.) 83; *Johanns v. Ficke*, 224 N. Y. 513, 518 [121 N. E. 358].)

The statute expresses a legislative intention to provide a remedy which did not inhere in the common law; and where such statutes have been adopted in relation to stable keepers they have been construed in the light of business usages and the customs of the people. Both in the case of draft horses and motor vehicles, temporary withdrawals from their housing places are characteristic of the stabling and garage business; and if the continuance of the lien must be held to be dependent on actual uninterrupted physical possession, the heart is cut out of the statute.

As regards proprietors of stables the rule has not been that uninterrupted possession must be maintained; and the court in *State* v. *Shevlin,* 23 Mo. App. 598, gives a construction to such statutes which has become almost universal. The court there says (pp. 601, 602):

". . . In the view we take of the meaning of the statute, the lien thereby conferred is not dependent upon an actual physical custody by the stable keeper at every moment of time. We think that the lien conferred by the statute subsists, even as against third persons without notice, while the horse is boarded in the stable of the lienor, although it may, with his consent, be used during the day by the owner in his business. To hold otherwise would be to construe the statute so as to deprive stable keepers of the protection which the legislature probably intended to give them; since, as is well known, in most cases where horses are boarded, the owner is allowed to use them in his business during the day. This being so, the statute could not have intended to allow the owner to destroy the lien of the stable keeper while having the possession of the horse on the street during the day, by selling or mortgaging it to a stranger without notice of the lien. On the contrary, we are of the opinion that every person is bound so far to take notice of the statute, that, when he is about to become the purchaser or mortgagee of a horse found upon the street in the custody of its owner, it is incumbent upon him to make inquiry as to the place where the horse is boarded, and whether anything is due for its keeping. There is no greater hardship in this rule than there is in the general rule in respect of purchases of personal property, that the purchaser gets no better title than the seller has."

So, also, in *Walls* v. *Long,* 2 Ind. App. 202 [28 N. E.

101, 103], a like view is expressed in the following language (p. 206):

" . . . It was a necessary part of that arrangement that the horses should be delivered to the defendant as they were needed, and this is part of the ordinary course of business of livery stable keepers, and therefore must be consistent with the right of lien that belongs to the occupation. . . . When it is considered to what extent livery stables are made use of by the public as places most suitable, in many respects and instances, for the boarding of horses in daily use, it is difficult to believe that the legislative intent or meaning is that which is contended for by the appellant's counsel. If the keepers of such stables were intended to be benefited by the statute only where the animal being fed and cared for was not taken from the stable and used by the owner or his family at all, the benefits both to the keepers and owners would be slight; for few persons would consider such an arrangement as either convenient or economical. It is obvious, in our opinion, that such is not the meaning of the statute. The appellees had no knowledge or reason to believe or suspect that the horse would not be returned as usual to the stable when last taken out. While the horse was being boarded by the appellees, the appellant was at their stable, and expressed himself as pleased with the care the horse was receiving. The appellees were not required to announce on each occasion that the horse went out that they had a lien upon him, and that therefore he must be returned. There was nothing in the contract between them and Beal inconsistent with the existence of the lien, nor had it been terminated by the payment of the board. There is nothing in the record from which it can be inferred that the appellees intended to waive their lien, nor does the evidence furnish any ground whatever for the belief, if it exists, by either the appellant or Beal, that there was any such intent."

See, also, *Young* v. *Kimball*, 23 Pa. St. 193; *Goldsmith* v. *Gensenleiter*, 14 Pa. Dist. R. 516, and 28 Pa. Co. Ct. Rep. 399; *Caldwell* v. *Tutt*, 10 Lea (78 Tenn.), 258 [43 Am. Rep. 307]; *Welsh* v. *Barnes*, 5 N. D. 277, 278, 279 [65 N. W. 675]; *McGlasson* v. *Hennessy*, 161 Ill. App. 387; *Heaps* v. *Jones*, 23 Mo. App. 617; 38 C. J. 81.

In New York the Court of Appeals in *Johanns* v. *Ficke,* 224 N. Y. 513 [121 N. E. 358], had occasion to construe section 183 of the lien law of that state giving to stable keepers a lien "dependent on possession" for the sum due for animals kept and vehicles stored pursuant to any express or implied agreement made with the owners. In this case the owner of certain horses obtained a year's credit from plaintiff on accrued charges of $860 for boarding and keeping the animals; and additional charges incurred . later increased the indebtedness in favor of plaintiff to $1056.82. With this amount owing, the horses were removed to defendant's stable without plaintiff's knowledge or consent. In the action brought by plaintiff to enforce his lien, the defendant asserted a lien under the statute and also under a chattel mortgage. The plaintiff was held entitled to priority; and upon the subject of maintenance of physical possession, the court, after quoting the statute, spoke thus (pp. 518–520 of 224 N. Y.):

" . . . It expresses the legislative intention to give to a livery stable keeper the lien which the common law did not give. In case the lien does not arise for the reason (the other statutory essentials to the lien existing) that the possession of the livery stable keeper is not actual, continuous and exclusive, the statute is nugatory as to the stable keeper. The temporary absences of horses and vehicles from the livery stable where they are boarded or kept is a characteristic and condition inseparable from and integral to the business. Temporary removals of the property are inherent in it. It was within the legislative comprehension that unbroken actual possession of the property by the stable keeper was impracticable. To enact that a livery-stable keeper shall have the lien, provided he does not part with the actual and exclusive possession, which he gets, generally speaking, to enable the owner to take and use the property away from the stable and his control, is unreasonable and of slight effect. . . .

"Unless the language compels we will not regard a statute as purposeless. It is always presumed, in regard to a statute that a result, reasonable and enforceable, was intended by it. (*Travelers' Ins. Co.* v. *Padula Co., Inc.,* 224 N. Y. 397 [121 N. E. 348].) The courts must, under the proper rules of construction, ascertain the intended

result and enforce it if expressed. The language of· the statute reveals that the word 'lien' within it was intended to have its common-law meaning, namely, the right to detain the property until the charges, in which the lien originated, are satisfied. The right to retain or detain property is exercisable only as to that possessed. The property may, however, be possessed either actually or constructively. Its owner cannot destroy the possession of the lienholder by force, trick or fraud or against his will. (*Bigelow* v. *Heaton*, 4 Denio (N. Y.), 496.) He cannot destroy the possession, or the lien, as between himself and the lienholder, at least, by receiving the property under the agreement to use it in a certain way for a special purpose, and thereupon return it provided the agreement be reasonably consistent with the existence of the bailment and there is not a voluntary relinquishment of the lien.''

While in New York the rights of a stable keeper are fixed by section 183 of the Lien Law, those of a garage proprietor are governed by section 184, which as amended in 1926 (Laws 1926, chap. 373) gives the garage-keeper a lien for storage, repair and supplies, with the right to detain the automobile as security "at any time it may be lawfully in his possession until such sum is paid", subject, however, to the exception, added in 1926, that if after thirty days from the accrual of the lien, the lienor allows the car to go "out of his actual possession", the lien shall become void as against conditional sales agreements and mortgages executed prior to the accrual of the lien, notwithstanding subsequent repossession by the lienor.

With the judicial construction of section 183 in mind, it is instructive to ascertain how far a like rule has been applied to section 184. There are cases dealing with this section both before and after the amendment of 1926.

In *Rapp* v. *Mabbett Motor Car Co.*, 201 App. Div. 283 [194 N. Y. Supp. 200, 203], decided in 1922, it was said in reference to sections 183 and 184 that they had respectively changed the common law in regard to livery-stable keepers and garage-keepers, and that "in both cases the temporary surrender of the chattel to the owner does not terminate the bailment or invalidate the lien".

This case was followed by *Willys-Overland* v. *Prudman Automobile Co.*, 196 N. Y. Supp. 487, decided also before

the · addition of the exception. This latter action was brought by plaintiff as mortgagee under a purchase-money mortgage against the defendant then in possession of an automobile stored by it for the owner, and held for payment of charges for service and supplies. The automobile, while being housed by defendant, had been surrendered from time to time to the owner for his use; and the plaintiff contended that its rights under its chattel mortgage were paramount to the lien of the defendant, and also that defendant's lien had been destroyed by interruption of its possession. The trial court, besides denying priority to the mortgagee, held that the garage-keeper's lien had not been forfeited; and upon this point said (p. 488):

" . . . This latter contention I do not think is sound, and is authoritatively disposed of by the case of *Johanns* v. *Ficke*, 224 N. Y. 515, 519 [121 N. E. 358, 360], where the Court of Appeals, construing an identical section (183) under the Lien Law (Consol. Laws, chap. 33) applicable to horses and horse-drawn vehicles stored in a livery-stable, said that:

" 'It was within the legislative comprehension that unbroken, actual possession of the property by the stable keeper was impracticable.'

"That case determined (224 N. Y. 521 [121 N. E., p. 361]) that the statute quoted was intended to protect livery-stable keepers against the rule of the common law that interruptions of actual, continuous, and exclusive possession were inconsistent with the existence of a lien. I conclude, therefore, that the defendant did not lose his lien because he permitted the use of the car by Schiffler."

The foregoing New York decisions were quoted, and the rule therein declared was applied, *In re Carter*, 21 Fed. (2d) 587, where the question arose between a garage-keeper and the creditors of a bankrupt.

So far as cases are affected by the amendment of 1926, the exception then added is held to limit the garage-keeper's lien as against conditional vendors and mortgagees to charges which accrued during a period of thirty days prior to the last day on which the motor vehicle was taken from the garage-keeper's actual possession with his consent. (*Smith* v. *Pierce Arrow Sales Corp.*, 224 App. Div. 769

[230 N. Y. Supp. 194]; *C. I. T. Corp.* v. *Schubert,* 137 Misc. Rep. 514 [243 N. Y. Supp. 748]; *Kamaran* v. *Sidney Garage,* 137 Misc. Rep. 744 [244 N. Y. Supp. 337].)

■ We have not this exception in our statute, but section 3051a, adopted in 1923 (Stats. 1923, p. 695), limits the lien given by section 3051 to $100 under any contract for work, services, care, or safekeeping made at the request of one not the holder of the legal title, unless such holder, if known, shall have had actual written notice from the lienor, given either by personal service or registered letter. (*Hessel* v. *Pickwick Stages System,* 100 Cal. App. 682 [280 Pac. 1016]; *Lindsay* v. *Kleiber Motor Truck Co.,* 110 Cal. App. 479 [294 Pac. 454].)

Under section 3051 it is not necessary that the lien claimant should have acted at the request of the legal owner; and a preferential lien may attach by reason of a debt created by one in lawful possession under a contract of conditional sale. (*Davenport* v. *Grundy Motor Sales Corp.,* 28 Cal. App. 409 [152 Pac. 932]; *Goodman* v. *Anglo California Trust Co.,* 62 Cal. App. 702 [217 Pac. 1078].)

In the present case Bonilla was a lawful possessor, but was not the holder of the legal title, and therefore the restriction of section 3051a puts a limitation on the lienor's claim as against plaintiff. ■ The plaintiff urges, however, that no lien can be asserted against it for any charges up to the time when unbroken possession began; and in support of this contention relies on *Goodman* v. *Anglo California Trust Co.,* 62 Cal. App. 702 [217 Pac. 1078], *Davis* v. *Young,* 75 Cal. App. 359 [242 Pac. 743], and *Covington* v. *Grant,* 82 Cal. App. 749 [256 Pac. 213]. These were all cases where, after an automobile had been repaired by a mechanic at the request of a conditional vendee and surrendered to him without payment, the automobile had, some weeks or months later, been brought back for other repairs and the mechanic then sought to detain the automobile for the earlier, as well as the later, charges. It was held in the cases cited that under such circumstances no lien on account of the earlier repairs could be asserted against the conditional vendor. In each of those cases there had been a voluntary unconditional surrender after the first repairs were made, and the lien was in consequence lost.

The distinction between such cases and those of stable-keepers and garage proprietors allowing periodic removal is concisely stated in the language of the court in *Gould* v. *Hill*, 43 Idaho, 93, 107 [251 Pac. 167, 171], where the court, speaking of an agister's statutory lien dependent upon possession, said: "As a general rule a common law or statutory lien, dependent upon possession, is waived or lost by the lienholder voluntarily and unconditionally parting with possession or control of the property to which it attaches. However, the lien is not waived or destroyed where there is an intention to preserve the same, the lienholder only conditionally parting with possession."

In the arrangement made between Bonilla and Freitas for Bonilla's accommodation while in financial straits, it is manifest that neither intended a termination of the bailment in the morning followed by a renewal at night, or a daily yielding of possession by Freitas on the mere individual credit of Bonilla. The arrangement between the two had been in existence several months before Bonilla entered into his contract with plaintiff's assignor on September 13, 1929; and those making, or later becoming interested in, such contract with Bonilla may well have been put on inquiry as to where Bonilla's automobile was kept and upon what conditions, especially as the contract imposed on Bonilla the duty to protect the car against the elements. As a conditional vendee in possession, Bonilla had the right to use the car in the way in which such property is customarily used and for all reasonable purposes; and he was under duty to give the car proper protection and maintenance.

In asserting its claim to superiority, plaintiff takes the position also that by parting with possession Freitas lost his lien by virtue of section 2913 of the Civil Code, declaring that "voluntary restoration of property to its owner" causes extinguishment of a lien dependent on possession. But since Bonilla, though in lawful possession, was not the legal owner, the section cited has no application to this case. (*Davis* v. *Young*, 75 Cal. App. 359, 363 [242 Pac. 743].)

The evidence shows that there was at no time any unconditional relinquishment of possession or permanent withdrawal of the automobile from the place of keeping.

The very nature of the bailment required temporary release, and it must be assumed that the statute was not enacted as a piece of futile legislation. The ways of the world and the usages of business were known to the legislators and, except for any special limitations, all classes of lienors designated in section 3051 have the same rights and remedies. (*First Nat. Bank* v. *Silva*, 200 Cal. 494, 497 [254 Pac. 262].) Hence, when the provision in favor of garage-keepers was tacked on to section 3051 in the year 1911, it is reasonable to infer that there was no more intention to require absolutely uninterrupted possession of an automobile than, under the great weight of authority, had previously been required in the case of animals housed and cared for by stable keepers, who had had the protection of that section since 1878. We are therefore of the opinion that the garage-keeper's lien upon the car did not become detached when the automobile was temporarily out of the garage in Bonilla's care. There had been an inchoate lien from the beginning of the bailment, and the indebtedness had matured before plaintiff's seizure of the car in the garage where actual physical possession was then being maintained by the proprietor. His lien (subject to the limitations of section 3051a) possessed at that time, as we believe, the same inviolability as if the actual possession had been continuously preserved.

Nor do we think that an impairment of the lien results from the clause in plaintiff's contract that Bonilla should not permit any lien to attach for storage, repairs or other cause. Such a provision was under review in *Albemarle Supply Co.* v. *Hind & Co.*, L. R. (1928) 1 K. B. 307; and not only was it held that such uncommunicated limitation of authority did not affect the lien of a garage-keeper making repairs on taxicabs for a conditional vendee, but also that the lien persisted even though the cabs went out each day to ply for hire. Speaking on this subject, Lord Justice Scrutton said (pp. 317, 318):

"The plaintiffs' first line of attack on the lien claim was a clause in their hire-purchase agreement providing that 'the hirer shall not have or be deemed to have any authority to pledge the credit of the owners for repairs to the vehicle or to create a lien upon the same in respect of such repairs.' This court in *Green* v. *All Motors, Ltd.*,

(1917) 1 K. B. 625, has held that the mere knowledge by the repairer that there is a hire-purchase agreement without knowledge of its exact terms relating to the car which he repairs does not deprive him of his lien. The owner leaving the cab in the hands of a man who is entitled to use it gives him an implied authority to have it repaired with the resulting lien for repairs. Rowlatt, J., had held in a previous case, and the judge below in the present case followed his decision, that a contractual limitation of authority not communicated to the repairer does not limit the implied authority derived from the hirer's being allowed to possess and use the car. I agree with this view; if a man is put in a position which holds him out as having a certain authority, people who act on that holding out are not affected by a secret limitation, of which they are ignorant, of the apparent authority. The owners can easily protect themselves by requiring information as to the garage where the cab is kept, and notifying the garage owner that the hirer has no power to create a lien for repairs. They will thus escape the lien, though they may not get their cab repaired.

"The plaintiffs next contend that any lien was lost because the cabs went out of the possession of the garage each day to ply for hire. The defendant proved an agreement with Botfield at a time when the lien existed, that the cabs should be out for hire each day on the terms that they should be returned to the garage each night, the lien continuing while the cabs were in possession of the garage. I do not think any plying for hire under this agreement prevented the lien, if any, from continuing, and in my view repair of a damaged cab, though it may be described as 'maintenance', gave rise to a repairer's lien."

The bill of charges presented by the defendant Freitas at the trial of the action amounted to $183.72; but it contained certain items for which a lien did not attach to the De Soto sedan automobile. Before Bonilla acquired that car in January, 1929, he had had another car which was stored with Freitas between November, 1928, and January, 1929, and the storage charge for that car having been included in the bill presented by Freitas at the trial, his attorney thereupon disclaimed any right to a lien for those items. The bill presented included also charges

for gasoline, oil and other supplies furnished to Bonilla from November, 1928, to December, 1929. But no lien for such supplies was authorized under section 3051 before the amendment which took effect on August 14, 1929; and accordingly the charge for supplies previously furnished was merely a personal claim against Bonilla.

There are decisions in reference to a stableman's lien in which the common-law rule of continuous possession is applied with the utmost strictness; and reference to them is found in the annotation in 3 A. L. R. 664, appended to the case of *Clarksburg Casket Co.* v. *Valley Undertaking Co.,* 81 W. Va. 212 [94 S. E. 549]. The predominant view, however, has favored a more liberal and beneficial application of the law; and in so far as garage-keepers are concerned, the modern trend is toward an extension of the remedy so as to keep the lien alive and authorize detention for sums due, if the automobile of which possession has been relinquished comes *at any time thereafter* into the lawful possession of the lien claimant. Such is the statutory law in New York, New Jersey, New Mexico, Oregon and District of Columbia. (*C. I. T. Corp.* v. *Schubert,* 137 Misc. Rep. 514 [243 N. Y. Supp. 748]; *Frank* v. *Daily,* 92 N. J. L. 118 [105 Atl. 9]; *Abeytia* v. *Gibbons Garage,* 26 N. M. 622 [195 Pac. 515]; *Courts* v. *Clark,* 84 Or. 179 [164 Pac. 714]; *Barrett* v. *Commercial Credit. Co.,* 54 App. D. C. 249 [296 Fed. 996].)

The statute in California does not go that far; but in our opinion the lien of a garage-keeper upon an automobile is not destroyed because of his conditional relinquishment of the possession while the car is temporarily in use of the bailor.

It is urged however, upon the authority of *Thourot* v. *Delahaye Import Co.,* 69 Misc. Rep. 351 [125 N. Y. Supp. 827], that whatever the rule as to constructive possession may be between the garage proprietor and the bailor, actual continuous possession is essential when other interests, such as those of a mortgagee or conditional vendor, are affected. In our opinion no such distinction is contemplated in our statutes. Section 3052 of the Civil Code prescribes the method of foreclosing liens acquired under section 3051; and in relation to liens on automobiles contains specific directions concerning service of notice of sale on both the legal and

the registered owner, gives the legal owner a right of redemption on payment of the lien charges and costs, and in case of sale a right to any surplus remaining after satisfaction of the lien and the expenses of foreclosure. In *First Nat. Bank* v. *Silva,* 200 Cal. 494 [254 Pac. 262], *Mortgage Securities Co.* v. *Pfaffmann,* 177 Cal. 109 [L. R. A. 1918D, 118, 169 Pac. 1033], and *Kranzthor* v. *Faulkner Co.,* 43 Cal. App. 441 [185 Pac. 305], the rule is promulgated that every lien claimant under section 3051 (subject now to the limitation of section 3051a), has the same right and remedies, and that every lien so authorized is entitled to preference over the lien of pre-existing chattel mortgage. There is no logical distinction between a lien for repairs and a lien for storage and supplies *Wolfman Co.* v. *Eisenberg,* 116 Misc. Rep, 43 [190 N. Y. Supp. 259]); and the provisions of section 3052 show indisputably an intention to make the lien of a garage-keeper for storage, repairs and supplies superior to the interest of a conditional vendor. Contracts of conditional sale equally with chattel mortgages must be deemed made with knowledge of the lien law; and when, for default of the vendee, the vendor asserts his right of recaption, he must do so in subordination to subsisting liens created under section 3051 as limited by section 3051a. (See *Singer Mfg. Co.* v. *London & S. W. R. Co.,* L. R. (1894) 1 Q. B. 833, 837.) In our view the lien is preserved by constructive possession not only against the conditional vendee, but against the conditional vendor as well. (*Albemarle Supply Co.* v. *Hind & Co.,* L. R. (1928) 1 K. B. 307.)

The judgment is reversed and the case remanded to the municipal court for further proceedings in accordance herewith.

Cabaniss, J., and Goodell, J., concurred.